IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| D&T ADVISORS, LLC, <br><br> Plaintiff, <br><br> v. <br><br> NEIL S. WATERMAN, III, <br><br> Defendant. | No. 3:22-cv-00399-S-BT |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION**
**OF THE UNITED STATES MAGISTRATE JUDGE**

Plaintiff D&T Advisors, LLC (D&T) filed an emergency motion for preliminary injunctive relief in this civil action arising under the Anti-Cybersquatting Protection Act (ACPA), 15 U.S.C. § 1125(d). Mot. (ECF No. 7). The Court held a hearing on the Motion on March 3, 2022. Having considered the parties' arguments, the evidence of record, and the applicable law, the Court finds and concludes that D&T failed to establish a substantial threat that irreparable harm will result if the Court does not grant the relief requested. Accordingly, the Court recommends the Motion be DENIED.

This is a dispute regarding ownership of the internet domain "artemisdallas.com" (the "Domain"). In or around October 2020, Defendant Neil Waterman, Richard Emery, and Anne Jones contemplated going into business together. Those plans never came to fruition. But before Waterman, Emery, and Jones parted ways, Waterman purchased the Domain from GoDaddy.com. Almost

three months later, Emery and Jones formed D&T, and on December 28, 2021, D&T started doing business as Artemis Partners Dallas. Sometime in late January or early February 2022, Waterman changed the password on his GoDaddy.com account.

As a result of this action, D&T contends that Waterman now has exclusive control over the Domain, including D&T's email settings and security, and that Waterman can shut down the Domain or transfer it to a third party at any time. D&T made several entreaties to Waterman to transfer the Domain. When Waterman refused unless D&T paid him $1.5 million or a $150,000 annual licensing fee, D&T filed this lawsuit for "cyber-extortion." *See generally* Compl. (ECF No. 1).

One week later, on February 25, 2022, D&T filed its Emergency Motion for Order to Show Cause for Preliminary Injunction and Temporary Restraining Order. Specifically, D&T asks the Court to order that: (1) Waterman be prohibited from taking any action to access, shut down, or in any way affect the Domain and any emails associated with the Domain; and (2) that Waterman restore credentialed access to the Domain to D&T's IT contractor, Travis Tipps, and to grant Tipps exclusive access to manage the routine security and functionality of the Domain as a neutral party without changing ownership or transfer settings in the account pending settlement by the Parties or further order of the Court. Mot. 13.

A court may grant a preliminary injunction or a TRO only when the movant establishes that: (1) there is a substantial likelihood that the movant will prevail on

the merits; (2) there is a substantial threat that irreparable harm will result if the injunction is not granted; (3) the threatened injury to the plaintiff outweighs the threatened harm to the defendant; and (4) the granting of the preliminary injunction will not disserve the public interest. *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987); *Canal Auth. of Fla. v. Callaway*, 489 F.2d 567, 572 (5th Cir. 1974) (en banc). The party seeking such relief must satisfy a cumulative burden of proving each of the four elements enumerated before a preliminary injunction or TRO can be granted. *Miss. Power and Light Co. v. United Gas Pipeline*, 760 F.2d 618, 621 (5th Cir. 1985); *Clark*, 812 F.2d at 993; *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989). "Otherwise stated, if a party fails to meet any of the four requirements, the court cannot grant the TRO or preliminary injunction." *Greer's Ranch Café v. Guzman*, 540 F. Supp. 3d 638, 645 (N.D. Tex. 2021) (O'Connor, J.) (internal quotations and citation omitted). "The decision to grant a preliminary injunction is to be treated as the exception rather than the rule." *Miss. Power & Light*, 760 F.2d at 621.

  Here, the Court should deny D&T's request for preliminary injunctive relief because D&T failed to establish a substantial threat that irreparable harm will result if the Court does not grant an injunction. The "central inquiry in deciding whether there is a substantial threat of irreparable harm is whether the plaintiff's injury could be compensated by money damages." *Allied Market'g Grp., Inc. v. CDL Market'g, Inc.*, 878 F.2d 806, 810 n.1 (5th Cir. 1989) (citation omitted). And although economic harms are usually recoverable, this is not the case "when the

3

nature of those rights makes establishment of the dollar value of the loss . . . especially difficult or speculative." *Id.* (rejecting the contention that the district court erred in finding irreparable harm where injury was damage to the goodwill of the plaintiff's customers because of confusion between the plaintiff's matters and those of the defendant).

Courts have determined that irreparable harm exists when a domain owner is locked out of its domain and denied access to emails and when a domain owner is restricted from transferring its domain name. *See Domain Prot., LLC v. Sea Wasp, LLC*, 2019 WL 3219939, at *3-4 (E.D. Tex. July 17, 2019). By contrast, courts have held that speculative bad conduct related to a domain's use by a defendant does not rise to immediate and irreparable harm. *Acumen Enters. v. Morgan*, 2011 WL 1227781, at *3 (N.D. Tex. Mar. 29, 2011) (Lindsay, J.).

For example, in *Acumen*, the plaintiff was a business with the name Acumen Enterprises and used the domain "acumen-enterprises.com." *Id.* at *1. The defendant purchased the same two-word domain without a hyphen and had an unrelated business. *Id.* The defendant had a catch-all email and received emails from the plaintiff's current and prospective customers when they failed to remember the hyphen in the plaintiff's email addresses. *Id.* On multiple occasions, the defendant responded "with antagonistic or abrasive remarks" when he inadvertently received the plaintiff's emails. *Id.* He also made "no effort to clarify that the [email] senders had reached the wrong person." *Id.* On different occasions, he offered to sell plaintiff the nonhyphenated domain for $20,000 and $25,000.

4

*Id.* at *2. The court noted this was "more than two thousand times [the defendant's] costs to register the domain." *Id.* at *3. The plaintiff sued under ACPA and other causes of action. The plaintiff asked the court to grant injunctive relief, asserting they were irreparably harmed because the "reputation and company goodwill will continue to be tarnished because of [the d]efendant's abrasive emails to unknowing senders." *Id.* The court refused to grant an injunction determining "these alleged harms are [not] immediate and irreparable because they are speculative." *Id.* The court noted the "[p]laintiff understandably assumes the worst about [the defendant]." *Id.* The court held that the lawsuit "would be just as likely to prompt [the defendant] to respond positively and reasonably . . . rather than further agitate" the situation. *Id.*

In this case, D&T argues there is a substantial threat of irreparable harm if the injunction is not granted because:

> [T]he Domain Name is the Plaintiff's name, and Plaintiff's customers expect that the website's domain and email "@artemisdallas.com" connect them with Artemis Dallas operated by Jones and Emery . . . . [A]ny change in the operation of the Domain Name would necessarily link Jones and Emery's Artemis Dallas with content they did not endorse or control. Such changes more than merely risk confusion as to the source, sponsorship, affiliation and endorsement of those sites.

Mot. 10. D&T also contends Waterman's now exclusive control of the Domain gives him the power to "shut down the web features (in particular, the website and email functionalities), or even transfer the Domain and its functionalities to a third-party." Mot. 3. D&T further asserts that Waterman is preventing it from installing security updates to its website and email system, and as a result, D&T can no longer

5

"ensur[e] that [its customers'] private information remains protected from improper disclosure through up-to-date industry standard security settings, tools, and software updates." Emery Decl. ¶ 13 (ECF No. 7-1).

But Waterman controlled the Domain since before D&T's inception, and Waterman could have made any of the changes D&T fears at any time. Mot. at 3; Resp. 3; *see* Def.'s App. pt. 6 (ECF No. 16-6); *see also* Def.'s App. pt. 7, at 31-35 (ECF No. 16-7). Waterman presented a sworn declaration stating he has not "threatened nor attempted to delete or even access anything on the Domain." Waterman Decl. ¶ 33, *in* Def.'s App. pt. 7, at 10. He also has not "threatened nor attempted to shut down the Domain." *Id*. And he has not "refused to make any specific security update to the Domain." *Id.*

D&T failed to rebut this evidence. D&T also failed to offer any evidence of the extent of its alleged injury; that is, it offered no evidence of the number of customers it serves or the nature or amount of information that is allegedly at risk. And in a sworn declaration provided by D&T, Tipps claims "Waterman stated, 'well, I own [the Domain], so I don't want any changes done to it.'" Tipps Decl. ¶ 6 (ECF No. 7-2). Therefore, according to D&T's IT consultant, Waterman expressed he had no intent to change the status quo.

Furthermore, at the hearing, Waterman himself represented to the Court that he does not intend to access, alter, or shut down the Domain. Waterman even indicated he would agree to certain terms of a proposed agreed order, including an order (1) prohibiting him from taking any action to access, shut down, or in any

way effect the Domain and any emails associated with the Domain; and (2) restoring Tipps's credentialed access to the Domain so Tipps can manage the routine security and functionality of the Domain without changing ownership or Domain transfer settings in the account. Waterman only balked at giving Tipps exclusive and unsupervised access to the Domain because it resides in his personal GoDaddy.com account along with other domain names not at issue in this litigation. D&T failed to demonstrate Waterman has any intent to do any bad acts, and during the hearing, D&T even admitted it "does not think Waterman wants to mess with the Domain."

Like in *Acumen*, this Court understands D&T's concerns regarding potential bad acts by Waterman. But—especially in view of Waterman's express statements to the Court during the hearing—these concerns are speculative. The Court sees no immediate threat that Waterman will change the Domain in a way that would adversely impact D&T's operations during the pendency of this litigation. Accordingly, D&T failed to establish a substantial threat that irreparable harm will result if the Court does not grant an injunction. While Waterman argues the request should be denied on other grounds, this finding pretermits consideration of Waterman's other arguments.

Hence, the Court should DENY D&T's request for a TRO and a preliminary injunction.

7

**SO RECOMMENDED**.

March 11, 2022.

                                                REBECCA RUTHERFORD
                                                UNITED STATES MAGISTRATE JUDGE

**INSTRUCTIONS FOR SERVICE AND
NOTICE OF RIGHT TO APPEAL/OBJECT**

      A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to any part of this report and recommendation must file specific written objections within 14 days after being served with a copy. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific. Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error. *See Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).